**JARBOE BROS. STORAGE WAREHOUSES, INC., Appellant,**

v.

**ALLIED VAN LINES, INC., Appellee.**

**No. 11861.**

United States Court of Appeals Fourth Circuit.

Argued March 7, 1968.

Decided Sept. 5, 1968.

Certiorari Denied Jan. 13, 1969.

See 89 S.Ct. 626.

Hamilton O'Dunne, Baltimore, Md. (Patrick A. O'Doherty, Baltimore, Md., on brief), for appellant.

Francis D. Murnaghan, Jr., Baltimore, Md. (Joseph H. H. Kaplan, Baltimore, Md., and James W. Tallant, Chicago, Ill., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BUTZNER, Circuit Judge, and MERHIGE, District Judge.

BUTZNER, Circuit Judge:

After the president of Jarboe Bros. Storage Warehouses, Inc., was convicted of a felony for submitting false transportation bids, Allied Van Lines, Inc., canceled Jarboe's agency contract. Jarboe sued to enjoin cancellation. The district court—concluding that Jarboe had breached the contract, that the breach had not been cured, and that the procedure Allied followed in terminating the contract was proper—granted Allied's motion for dismissal under Federal Rule of Civil Procedure 41(b) and denied the injunction. We affirm.

Allied was formed as a not-for-profit corporation under the general corporation laws of Delaware by a number of independent warehousemen. It was designed to provide nationwide business for individual carriers of household goods, primarily by assuring that return loads would be available on long distance hauls. In 1945, in order to permit Allied to qualify as a carrier with the Inter-

state Commerce Commission under the Motor Carrier Act, its individual members agreed to assign their operating rights to transport household goods in interstate or foreign commerce to Allied for the nominal sum of one dollar. Each became a stockholder in Allied by purchasing one share of its capital stock for ten dollars and entered into a noncarrier agency agreement with Allied. No dividends, other than possible liquidating dividends upon dissolution of Allied, are payable upon the common stock, and all revenues are returned to the agents who originated them, after deducting pro rata the cost of Allied's business. The agents agreed to sell to Allied their shares of common stock at par value or book value, whichever is greater, upon cessation of their agencies. Although Allied conducts intrastate operations in thirteen states, it is primarily an interstate carrier. It is not licensed to carry on intrastate business in Maryland.

Jarboe transferred to Allied its interstate rights for eleven states and the District of Columbia. In turn, it received a share of common stock and a noncarrier agency contract. Allied did not purchase Jarboe's intrastate business. In 1961 Lester J. Feit acquired all the outstanding stock of Jarboe and became its president.

In 1966 the United States District Court for the District of Maryland fined Feit $21,000 and imposed an eighteen month suspended sentence upon his plea of guilty to an indictment charging mail fraud and submitting false bids to a federal agency. Feit, as president of Jarboe, had submitted inflated bids for the intrastate moving of three companies dislocated by federal urban renewal projects. He had used Jarboe's stationery which displayed the Allied name and mark. To make his bids seem competitive, Feit had forged higher bids on the stationery of another Allied agent, Capital Moving & Storage Co. This stationery also bore Allied's name and mark. Jarboe's truck bearing Allied's name was used in connection with one of the moves.

## I.

Jarboe first contends the contract was not breached because it imposed obligations on the parties only when Jarboe was handling a shipment in interstate or foreign commerce, and here the hauls were entirely within Maryland. We reject this argument.

An agent impliedly covenants that he will conduct himself with such decency that he will not injure his employer. See 9 Williston, Contracts § 1014A (3d ed. 1967). This duty of good conduct has been summarized as follows:

> "Unless otherwise agreed, an agent is subject to a duty not to conduct himself with such impropriety that he brings disrepute upon the principal or upon the business in which he is engaged * * * ." Restatement (Second) of Agency § 380 (1958).

The commission of a serious crime is mentioned in the Restatement comment as one type of conduct that may breach the agent's duty. Feit's use of Allied's name to achieve his illegal advantage clearly violated the implied duty of good conduct Jarboe owed Allied.

Feit's crime also breached paragraph 2 of the agency contract, in which Jarboe covenanted:

> "To perform and discharge loyally, diligently and efficiently, all the duties and responsibilities of such agency and employment, under Carrier's complete and exclusive control, direction and supervision and in strict compliance with Carrier's then reasonable rules and regulations, as well as with all laws, orders and regulations of competent governmental authority."

The fact that the fraud involved intrastate shipments does not absolve Jarboe. Allied conducts intrastate operations in a number of states and uses the same contracts, drivers' manual, rules and regulations, offices and personnel for them as it does for interstate business. Its agents use their equipment and vehicles for both interstate and intrastate shipments. The agency contract did not ex-

pressly restrict Jarboe's rights and duties to interstate shipments. Jarboe had the right to use its stationery and vehicles bearing Allied's name and mark in the transaction of its intrastate business. And the public had no way of telling whether Jarboe was acting in its own capacity or for Allied.

## II.

■ Jarboe next contends that even if the contract were breached, Allied's board of directors wrongfully took the position that Feit's conviction was a breach that could not be cured. It relies on paragraph 3 of the contract, which provides:

"3. The Parties mutually covenant:

"3.1 The term hereof shall be for a period of one (1) year from date and thereafter until terminated as follows: Agent may terminate this contract with or without cause upon ninety (90) days written notice to Carrier; Carrier may terminate this contract upon ten (10) days notice to Agent if and only if

"Agent for a period of ninety (90) days after notice by the Carrier so to do shall fail or refuse to cure or remedy any breach by him of this agreement claimed by the Carrier in such notice, unless within such period the Agent shall either

"(1) demand arbitration as provided in section 3.2 hereof, in which case the contract may be terminated by the Carrier if Agent shall fail fully to comply with the award of such arbitration within thirty (30) days after notice so to do; or

"(2) file an action or suit in a court of competent jurisdiction to enjoin such termination in which case the contract may be terminated by the Carrier if and only if there shall be no final decree or judgment of such court enjoining such termination."

The district judge properly held this paragraph entitled Jarboe to an opportunity to cure the breach. But his findings of fact do not support Jarboe's contention that the board of directors took the position that the breach was incurable. The trial judge found, first, that Jarboe was given an opportunity to cure the breach and, second, that it did not do so. These two findings are amply supported by the record and are therefore binding on us under Rule 52 of the Federal Rules of Civil Procedure.

A month after Feit had pleaded guilty, the general counsel of Allied, at the direction of the board of directors, wrote Jarboe that Feit's conviction breached the agency contract. He also told Jarboe that its failure to remedy the breach within ninety days would result in termination of the contract ten days after the expiration of the ninety-day period. Jarboe's secretary replied that Jarboe would endeavor to cure the breach by performing loyally, diligently and efficiently all the duties and responsibilities of the agency and that unless it failed to do so within ninety days, the contract could not be canceled. Later Jarboe's counsel suggested that some period of probation be worked out.

As a possible cure, Allied's counsel suggested divestiture of Feit's interest, an end to his relationship, and a change in agency name. Jarboe took no steps to do this. It continued Feit in control of its business. It also rejected Allied's offer to substitute a contract that could be canceled by Allied for cause without affording Jarboe an opportunity to remedy any breach. In the meantime, Jarboe was disqualified by the army from carrying household goods. Finally, on April 27, 1967, almost five months after its initial notice, Allied canceled the agency contract.

## III.

Jarboe next argues that the procedure adopted to cancel its contract was arbitrary and illegal. It contends that cancellation, carrying with it the obligation to surrender stock, is not permitted by the law of Delaware where Allied is incorporated. It also asserts that even if the contract could be canceled, the board

of directors did not have the authority to do so. In support of its position it relies on Frezzo v. Delaware Mushroom Co-op., 38 Del.Ch. 375, 152 A.2d 303 (1959), which held that a corporation organized under Delaware stautes creating agricultural associations was not empowered to expel a member. Jarboe also relies on State ex rel. Boldt v. St. Cloud Milk Producers' Ass'n, 200 Minn. 1, 273 N.W. 603 (1937), which held that, in the absence of a bylaw, the board of directors of a co-operative created under Minnesota's Co-operative Marketing Act could not expel a member.

 Neither of these cases is applicable. A contract expressly permits the termination of Jarboe's agency and outlines the procedure to accomplish this. In the cases cited by Jarboe no similar contracts existed. Furthermore, the general corporation law of Delaware provides for management of a corporation by its board of directors and authorizes the board to secure the fidelity of its agents.[1] Also, Allied's certificate of incorporation provides that if the holder of stock ceases to be an agent, he shall offer his stock for sale to the corporation. Finally, the provisions in the contract which allow the cancellation of the agency agreement and the consequent repurchase of stock held by the agent do not violate public policy, as Jarboe contends. They are reasonable, contractual sanctions to insure the honesty of Allied's agents.

██ Jarboe also urges that Allied's failure to proceed under section 27 of its bylaws invalidates the cancellation of the contract. Section 27 creates a complaint committee to consider and report to the board of directors all complaints made against agents. After notice to the agent and a hearing, the committee may make recommendations for penalties, including cancellation of the agent's contract. The board of directors is authorized to review the recommendations, together with the objections of the agent, and enforce the penalty. The bylaws, however, do not require that this procedure be followed in every case. They make it "supplemental to and not in limitation of the general powers of the Board of Directors of the Corporation to deal with particular agents and circumstances so as to protect and enhance the best interests of the Corporation * * *."

The contract entitled Jarboe to notice. and a hearing before its agency was terminated. These requirements were satisfied. Allied gave specific notice of the reason for the cancellation in the letter written by its general counsel. By contract the parties had dispensed with an intra-corporate hearing, and substituted proceedings before an arbitrator or a court at the option of the agent. Jarboe elected to have its hearing before a court.[2] The district judge was alert to the critical part the application for an injunction played in the contractual and corporate relationship of the parties. Over Allied's protests, he declined to apply such conventional defenses as an adequate remedy at law and unclean hands. He correctly interpreted the contract to require an independent appraisal of the conduct of both parties in order to determine whether termination was permissible.

The judgment is

Affirmed.

---

1. Del.Code Ann. tit. 8, ch. 1, §§ 141(a), 142(c) (1953).

2. Jarboe appeared with counsel before the Allied board of directors in February 1967 to oppose the termination of its contract.

While the opportunity afforded Jarboe to present its position at this intra-corporate meeting lends support to Allied's contention that Jarboe was not denied due process, the case does not turn on the adequacy of this hearing.